**STATE of Iowa, Appellee,**

v.

**Helen H. SIMMONS, Appellant.**

**No. 62628.**

Supreme Court of Iowa.

March 19, 1980.

Rehearing Denied April 17, 1980.

Raymond E. Pogge of Pogge, Root & Steege, Council Bluffs, for appellant.

Thomas J. Miller, Atty. Gen., and Bennett Cullison, Jr., Harlan, for appellee.

Considered by LeGRAND, P. J., and UHLENHOPP, McCORMICK, ALLBEE and McGIVERIN, JJ.

LeGRAND, Justice.

This is the latest in a long line of cases dealing with riparian titles along the Missouri River. It involves a suit to quiet title to land which the State of Iowa claims as part of the riverbed. Originally there were a number of defendants, but there remains only one. She is Helen Simmons, the appellant, who challenges the State's title and asserts she owns the land in dispute by virtue of several quitclaim deeds from Harrison County, Iowa, executed and delivered to her and her now deceased husband in 1954. The trial court found for the State and we affirm.

I. Prior to 1938, the land in question lay wholly in Nebraska. In that year, the United States Corps of Engineers undertook the sizeable task of stabilizing the unpredictable and capricious Missouri River. As a result of this man-made avulsion, the river was moved to the west and thereafter the disputed area lay on the Iowa side of the river. This anomaly—land within the borders of one state but actually being part of another—led to the adoption of a compact between Nebraska and Iowa which fixed "the middle of the main channel of the Missouri River" as established by United States engineers' office as the new and permanent boundary line between the two states. *See Nebraska v. Iowa*, 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733, 736 (1972). This compact was approved by the Congress of the United States on July 12, 1943, which is hereafter referred to as the compact date.

The compact terms are reflected in identical statutes enacted by each state. The Iowa statute provides in part as follows:

Sec. 2. The State of Iowa hereby cedes to the State of Nebraska and relinquishes jurisdiction over all lands now in Iowa but lying westerly of said boundary line and contiguous to lands in Nebraska.

Sec. 3. Titles, mortgages, and other liens good in Nebraska shall be good in Iowa as to any lands Nebraska may cede to Iowa and any pending suits or actions concerning said lands may be prosecuted to final judgment in Nebraska and such judgment shall be accorded full force and effect in Iowa.

Both statutes are set out at pages lxxv and lxxvi, Iowa Code 1979.

In an action brought to construe and enforce this compact, the Supreme Court said in *Nebraska v. Iowa*, 406 U.S. at 120, 92 S.Ct. at 1381, 31 L.Ed.2d at 736–37:

The fixing of the permanent boundary by Compact resulted in some riparian lands formerly in each State being located within the other State. This created the problem of the effect to be given by the new State to titles, mortgages, and other liens that had arisen under the laws of the other State. Sections 2 and 3 of the Compact were designed to solve this problem. Under § 2 each State "cedes" to the other State "and relinquishes jurisdiction over" all such lands now located within the Compact boundary of the other. Under § 3, "[t]itles, mortgages, and other liens" affecting such lands "good in" the ceding State "shall be good in" the other State.

In 1949 the Missouri River once again broke out of its channel and began to spill over its banks. This overrun was gradual, continuing from 1949 to 1954, and eventually extending approximately one mile east of

the "stabilized" channel as established by the Corps of Engineers some ten years earlier. By July, 1954, the river had extended eastward far enough to destroy that part of the disputed land which had originally been in Nebraska but which became part of this state by the terms of the compact. The river stayed in that condition until 1959, when the United States Corps of Engineers again brought the Missouri under control. They restored the channel to its approximate 1938 location, where it has remained since.

We have, then, this factual situation. The land to which the State claims title was once part of the state of Nebraska. The compact ceded it to Iowa on the condition that then existing titles should be recognized and enforced under provisions of Nebraska law.

The State's claim rests exclusively on events occurring after the compact date. The State concedes it had no title to this land before then but says the action of the river between 1949 and 1954 completely eroded and washed the land away, allowing the river to take over where land had once been.

Two important questions are thus raised: 1) What was the nature of the action of the river between 1949 and 1954? 2) What is the effect of the compact on events affecting real estate titles which occur after the compact date?

■ Our review is de novo. In reviewing this matter, we recognize the rule that one seeking to quiet title must do so on the strength of his own title and not rely on the weakness of another's. *Wilcox v. Pinney*, 250 Iowa 1378, 1381, 98 N.W.2d 720, 722 (1959).

■ II. In considering the first question, we point out that if the action of the river amounted to an avulsion—a sudden and perceptible change in the channel which cuts off a body of land—the title of riparian owners would not be affected. *Jeffery v. Grosvener*, 261 Iowa 1052, 1063, 157 N.W.2d 114, 122 (1968); *Payne v. Hall*, 192 Iowa 780, 783, 185 N.W. 912, 914 (1921).

Similarly title is unaffected if the overflow is temporary so that the submerged land reappears within a reasonable time. But if it was a gradual erosion, title would be lost and new title to the riverbed would vest in the state. *Grosvener*, 261 Iowa at 1063, 157 N.W.2d at 114. We quote from *Wilcox v. Pinney*, 250 Iowa at 1382–83, 98 N.W.2d at 723:

> Right or wrong, it is well established that lands of a riparian owner are as subject to being lost by the gradual process of erosion by the river as they are of being added to by the process of accretion. We said in *Payne v. Hall*, 192 Iowa 780, 783, 185 N.W. 912, 914: "Where the lands of a riparian owner are removed by the gradual process of erosion by the river, the land being no longer capable of identification, but having been carried away entirely, and the river occupies the identical space formerly occupied by the lands of the riparian owner, the title to the land so occupied by the bed of the river passes from the owner of the land to the state."

See also *Rupp v. Kirk*, 231 Iowa 1387, 1391, 4 N.W.2d 264, 265 (1942). This quoted language later formed the cornerstone for *Tyson v. Iowa*, 283 F.2d 802, 807 (8th Cir. 1960).

■ We believe the evidence compels the conclusion that the land in dispute was lost by erosion. The action of the river between 1949 and 1954 was gradual. It extended bit by bit until it occupied the whole area which Mrs. Simmons claims. All vegetation was destroyed. There was no sign of growth or trees. The land was no longer capable of identification. It was "carried away entirely" and the river then occupied the "identical space formerly occupied by the lands of the riparian owner." The trial court held this to be true, and we agree with that finding. Neither can it be considered temporary or one which would recede of its own volition. It was, we believe, permanent and complete. It would, in fact, still be extended that far except for the action of the Corps of Engineers in moving the channel westward once more. Under

such circumstances, the bed of the river included the area now in issue. *See Solomon v. City of Sioux City*, 243 Iowa 634, 638, 51 N.W.2d 472, 475 (1952).

Consequently, we hold the State holds title to the area in question unless the terms of the compact dictate a contrary result.

■ III. Both parties rely on the compact as authority. However, Mrs. Simmons claims far too much for it. She argues, in effect, that title to land ceded by one state to another would thereafter *always* be determined under the law of the ceding state. We do not believe this is what the compact said or what it meant. The compact merely established a permanent boundary and directed that all titles, mortgages, or liens "good in" the ceding state *on that date* must be accepted as "good in" the other state. It did not say, nor did it suggest, that subsequent events should be considered and decided under the law ·of the ceding state. On the contrary, it is clear the compact intended no such result. This is really the significance of the distinction made in *Nebraska v. Iowa*, 406 U.S. at 122, 92 S.Ct. at 1383, 31 L.Ed.2d at 738, where the court said:

> The Special Master construed the word "cedes" . . . as meant by the States to describe all areas formed *before* [the compact date], regardless of their location with reference to the original boundary, whose "[t]itles, mortgages, and other liens" were, at the date of the Compact, "good in" the ceding State, and ruled that . . . the other State is bound to recognize such "[t]itles, mortgages, and other liens" to be "good in" its State and not to claim ownership in itself.

(Emphasis added).

Later (406 U.S. at 124, 92 S.Ct. at 1384, 31 L.Ed.2d at 739) the Court said:

> The Special Master recommended that as to areas formed *before* [the compact date], ·§§ 2 and 3 should be construed as limiting the State of Iowa to contesting with private litigants in state or federal courts the question whether the private claimants can prove title "good in Ne-

braska," and when private litigants prove such title, as obliging Iowa not to interpose Iowa's doctrine of state ownership as defeating such title.

(Emphasis added).

Stated otherwise, the proper interpretation of the compact is that titles (and liens) good in the ceding state on the compact date must be recognized and enforced as good in the other state. However, as to events occurring after the compact date, the law of the state in which the land lies controls. This is the import of *Tyson v.· Iowa*, 283 F.2d at 807, a case involving this same compact, where the court said:

> Some contention is made that the State [of Iowa's] title to the river bed is confined to the bed as it existed·at the time of the compact. There is no support for such contention. The quotation from the Wilcox case, supra, [*Wilcox v. Pinney*, 250 Iowa 1378, 98 N.W.2d 720 (1959)] clearly establishes that under Iowa law when the river moves over an owner's land and gradually destroys it completely, the title to the shifting river bed passes from the owner of the land to the State.

The quotation from *Wilcox v. Pinney* referred to by the *Tyson* court has been previously set out in this opinion. *Tyson* was cited with approval in *Nebraska v. Iowa*, 406 U.S. at 126, 92 S.Ct. at 1384, 31 L.Ed.2d at 740.

We hold the State has established good title to the disputed area and that the decree of the trial court should be affirmed.

■ IV. Several other issues demand brief discussion. Appellant filed a counterclaim asking damages for trespass, interference with the use and enjoyment of her property, and other matters. She moved for trial by jury on all issues. The trial court refused this demand and split the issues by an order which contained the following language:

> The Court finds the plaintiff's principal case is a quiet title action which issue is an action in equity to be tried to the Court. The Court finds that at this time the defendants have filed a counterclaim

requesting damages which is a matter of law, and if the parties desire, can be tried to a jury.

The Court, being fully advised in the premises, finds that the plaintiff's principal case as to the issue of title, for the convenience of the Court and all parties, should be tried to the Court and should be tried first. After that issue is disposed of, the Court can then, if the issue is still relevant, try the question of defendant's counterclaim and damages to a jury.

This was not error. The authorities cited by appellant do not help her but, on the contrary, offer support for the trial court's order. *See Morningstar v. Myers*, 255 N.W.2d 159, 161 (Iowa 1977).

As noted in *Morningstar*, our rules provide for splitting the issues where some are triable at law and some in equity. Trial of the equitable issues first is the rule rather than the exception. In *Morningstar*, we held there was compelling reason to try the law issues first because that course would likely dispose of the whole case. That is not true here, and the trial court properly exercised its discretion in determining the order of trial.

█ .V. Mrs. Simmons insists the State is precluded from asserting its claim because of the default of Gerald Jauron. Jauron, an employee of the Iowa Conservation Commission, was a defendant in the counterclaim action. He failed to appear or defend, and judgment by default was entered against him.

We do not see how Jauron's default can prejudice the State. He was not authorized to act for the State, and there was no privity between him and his employer which renders a judgment against him res adjudicata against the State.

Without extended discussion, we conclude none of the authorities cited lend the slightest support for the result appellant seeks.

VI. We hold against Mrs. Simmons, too, on her claim the State is barred by sections 614.12 and 614.17, The Code 1977.

█ The State's petition was filed in 1965. The counterclaim (in which the stat-ute of limitations was first raised) was filed in 1977. The statutory provisions relied on by Mrs. Simmons were not applicable to this matter until a 1970 amendment to section 614.17. At that time the State's petition had been on file more than five years and the case had been continued by agreement until the United States Supreme Court decided *Nebraska v. Iowa, supra*, in 1972.

We decline to construe the 1970 amendment to defeat a claim already being litigated when the amendment was adopted. We do not believe the legislature intended any such retrospective effect.

█ Furthermore, the statute relied on operates only in favor of one in possession of the land. Although there is conflicting evidence on this issue, we find the record does not bear out Mrs. Simmons' claim of possession. Rather, it supports the State.

We find no merit to this argument nor to the belated reliance on section 448.16, which we find inapplicable to the circumstances now before us. The State does not seek to set aside or annul the 1954 tax deed (which we have once before found to be void. *See Council Bluffs Savings Bank v. Simmons*, 243 N.W.2d 634, 637 (Iowa 1976), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 532, 50 L.Ed.2d 613 (1976)). The State's claim is bottomed on events which would divest her of title, no matter how valid it once was.

█ We mention, too, that Mrs. Simmons has abandoned any adverse possession claim and, by doing so, has abandoned, too, any reliance on section 448.16, The Code, which is an adverse possession statute.

We further find Mrs. Simmons' reliance on section 614.22 is misplaced. This is not an action to set aside, annul, or cancel a tax deed. The State's position is precisely the same whether that deed is set aside or not.

VII. Whether separately discussed or not, we have considered all the issues raised and find none of them entitles appellant to any relief. The judgment is therefore affirmed.

AFFIRMED.